**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

COMMONWEALTH OF VIRGINIA
DEPARTMENT OF EDUCATION,
Petitioner,

v.

RICHARD W. RILEY, United States

No. 95-2627

Secretary of Education; UNITED
STATES DEPARTMENT OF EDUCATION,
Respondents.

VIRGINIA SCHOOL BOARDS
ASSOCIATION,
Amicus Curiae.

On Petition for Review of an Order
of the United States Department of Education.
(94-76-0)

Argued: December 4, 1996

Decided: February 5, 1997

Before WILKINSON, Chief Judge, and RUSSELL, WIDENER,
HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER,
HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ,
Circuit Judges, sitting en banc.

_____

Reversed by published per curiam opinion. Chief Judge Wilkinson
and Judges Russell, Widener, Ervin, Wilkins, Niemeyer, Hamilton,
Luttig, Williams, Michael, and Motz voted to reverse. Judges
Murnaghan and Hall voted to affirm.

_____

**COUNSEL**

**ARGUED:** William Henry Hurd, Deputy Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Petitioner. Leslie A. Simon, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. **ON BRIEF:** James S. Gilmore, III, Attorney General, Paul J. Forch, Senior Assistant Attorney General, Joan W. Murphy, Assistant Attorney General, C. Tabor Cronk, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Petitioner. Deval L. Patrick, Assistant Attorney General, Dennis J. Dimsey, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondents. D. Patrick Lacy, Jr., Kathleen S. Mehfoud, HAZEL & THOMAS, P.C., Richmond, Virginia, for Amicus Curiae.

_____

**OPINION**

PER CURIAM:

Part B of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1411-20 (Supp. 1996), affords federal financial assistance to state and local education agencies for the education of disabled students. In order to qualify for funds under the IDEA, a state must submit a plan describing the policies and procedures governing the expenditure of the federal funds to the Office of Special Education Programs ("OSEP") for approval, and must meet certain additional requirements. One of these additional requirements is that the state "assure[ ] all children with disabilities the right to a free appropriate public education." 20 U.S.C. § 1412(1) (Supp. 1996). The Secretary of Education is directed to suspend all IDEA payments to a state if, after notice and opportunity for a hearing, the Secretary determines that the state has failed to substantially comply with any of IDEA's additional requirements. See id. at § 1416(a).

In August of 1992, the Commonwealth of Virginia submitted to OSEP its IDEA plan governing fiscal years 1993-95. The plan was conditionally approved and the Commonwealth received IDEA funding for 1993. The United States Department of Education subse-

2

quently learned that the State had in effect a policy -- like that the State maintains for its non-disabled students -- pursuant to which it could cease providing free education to disabled students who are expelled or suspended long-term for behavior unrelated to their disabilities. Invoking IDEA's requirement that states assure all disabled children "the right to a free appropriate education," the Department threatened to withhold Virginia's entire $60 million annual IDEA grant for fiscal years 1994 and 1995 unless Virginia amended its policies to provide private educational services to each of the State's 126 disabled students who had been expelled for reasons wholly unrelated to their disabilities.

Virginia refused to so amend its policy, maintaining that IDEA does not prevent school officials from discontinuing educational services to disabled students so long as those students are suspended or expelled for reasons unrelated to their disabilities. Virginia petitioned this court for interlocutory review, and we ordered the Secretary of Education to conduct an evidentiary hearing. See Commonwealth v. Riley, 23 F.3d 80 (4th Cir. 1994). The United States persisted in its position after the hearing, and on July 3, 1995, the Secretary issued a final ruling, providing in effect that, unless Virginia amended its disciplinary policy so it was no longer possible to discontinue the education of disabled students, the federal government could cut off all funding to Virginia under the IDEA.

Virginia appealed, claiming inter alia that, in order to condition a state's receipt of federal funds, Congress must clearly manifest through the language of the statute an unambiguous intent to do so, and that the IDEA included no such clear statement. On appeal, a divided panel of this court affirmed the Department of Education's construction of the IDEA and administrative ruling. See Commonwealth of Virginia v. Riley, 86 F.3d 1337 (4th Cir. 1996). Judge Luttig dissented. See id. at 1347-58. On October 11, 1996, the court granted Virginia's petition for rehearing en banc.

After reviewing the record and briefs, and following oral argument, Chief Judge Wilkinson and Judges Russell, Widener, Wilkins, Luttig, and Williams voted to reverse the ruling of the United States Department of Education and to adopt as their own the dissenting panel

3

opinion of Judge Luttig, <u>Commonwealth</u> v. <u>Riley</u>, 86 F.3d 1337, 1347-1358 (4th Cir. 1996), which holds as follows:

1. In order for Congress to condition a state's receipt of federal funds, Congress must do so clearly and unambiguously. <u>See South Dakota</u> v. <u>Dole</u>, 483 U.S. 203, 207 (1987). Language which, at best, only implicitly conditions the receipt of federal funding on the fulfillment of certain conditions is insufficient to impose on the state the condition sought.

2. Title 20, U.S.C. § 1412(1) guarantees that all children with disabilities be provided "the right" to a free public education; this section does not purport to require that every disabled child be provided a free public education regardless of state disciplinary policies governing the provision of educational opportunities to disabled students expelled or suspended for criminal or other serious misconduct wholly unrelated to their disabilities. Since the plain language of the IDEA does not, even implicitly, condition the receipt of IDEA funding on the continued provision of educational services to disabled students who are expelled or suspended long-term due to serious misconduct wholly unrelated to their disabilities, the United States Department of Education was without authority to condition the Commonwealth of Virginia's receipt of IDEA funding on the continued provision of free education to such students.

3. A substantial constitutional question under the Tenth Amendment would be presented were the Secretary of Education's interpretation of the IDEA upheld, as the withholding of the Commonwealth's entire IDEA funding allotment because of its refusal to provide private tutors to the 126 disabled students expelled or suspended for serious misconduct wholly unrelated to their disabilities resembles impermissible coercion, if not forbidden regulation in the guise of Spending Clause condition.

Judge Niemeyer wrote a separate opinion concurring only in Part I of Judge Luttig's dissenting panel opinion and in the judgment. Judge Hamilton wrote a separate opinion concurring only in Part I of Judge Luttig's dissenting panel opinion and in the judgment, which was joined by Judge Ervin. Judge Michael wrote a separate opinion concurring in the judgment. Judge Motz wrote a separate opinion con-

4

curring in the judgment. Judge Murnaghan wrote a dissent, which was joined by Judge Hall. Judge Hall wrote a dissenting opinion.

Copies of Judge Luttig's dissenting panel opinion, and all other opinions filed in this case, are attached.

<u>REVERSED</u>

_____

LUTTIG, Circuit Judge, dissenting:

For misconduct wholly unrelated to their disabilities, the Commonwealth of Virginia disciplines its handicapped students in the identical manner that it does its non-handicapped students. Believing that students -- handicapped or not -- who so completely disrupt the classroom as to prevent the educational process to continue or who actually commit serious crimes against society forfeit by their own misconduct their right to a free education, the Commonwealth expels such students from its classrooms until such time as they are willing to conform their behavior to that necessary for education to occur. During the period of expulsion, as part of the State's overall program for discipline in its public schools, the State allows its local school boards to suspend educational services to the expelled students. That is, for neither expelled handicapped nor expelled non-handicapped students does the Commonwealth require its local school boards to provide private tutors or other educational alternatives following expulsion, whether the expelled student finds himself in prison, in detention, or at home. Explaining its reasons for this policy, the State says: "[A] caring public school organization . . . applies this discipline as a last resort `wake-up' call of accountability." Br. at 9. And, within the Commonwealth, this disciplinary tool has proven to be one of the most effective means of instilling a sense of personal responsibility and accountability in the few obstinately antisocial among the State's youths. Indeed, the experience of the State is that "it is rare for an expelled student, when readmitted [which most are], to be expelled again." <u>Id</u>. at 11.

Bringing the full weight of the Federal Government to bear against the Commonwealth's educational policy decision not to require pri-

5

vate tutors in prisons and elsewhere for students who have committed serious crimes or otherwise so disrupted the educational process as to require their expulsion, the Department of Education has, in the first such enforcement action ever against a state, withheld Virginia's entire $60 million annual Individuals with Disabilities Education Act ("IDEA") grant until the Commonwealth capitulates to the Department's demands that it provide private educational services to these expelled handicapped students, 126 in number. This, notwithstanding that the State continues to provide education to the some 128,000 handicapped students who have not abused the educational opportunity provided them through the cooperative efforts of the Commonwealth and the United States, including those handicapped students whose misconduct warrants expulsion but who are not expelled because their misconduct relates to their disabilities.

In an argument that only the Federal Government could make, and which the majority uncritically accepts, the Department of Education and the Department of Justice contend that the State's refusal to provide private tutors for handicapped students expelled for criminal or other serious misconduct unrelated in any way to their disabilities violates the condition on Virginia's receipt of IDEA funds to "assure[ ] [to] all students with disabilities the right to a free appropriate public education." According to the Departments of Justice and Education, both the statute and sound policy require the States to provide private tutors, at taxpayer's expense, even to convicted murderers:

> THE COURT: Does the Department of Education take the view that if a disabled young person commits a felony murder and is incarcerated, then the State is still obligated to provide that person with an education?
>
> COUNSEL: Yes, I believe that the statute specifically contemplates the provision of special education services even in institutions . . . .
>
> THE COURT: So the State has to go in and provide a tutor to this felony murderer. That's the Department of Education's view?
>
> COUNSEL: Yes.

6

Oral argument, April 4, 1996.

In order to require the States to provide private education to students expelled for reasons unrelated to their handicaps, and thus commandeer from the States their core function of ensuring order and discipline in their schools, Congress would have had to have spoken in affirmative and unambiguous terms, so that there could be no question whatsoever of its intent. Not only did the Congress not unambiguously require the States to provide the continuing education at issue, it all but codified the common sense proviso that such an education need not be extended to such students.

Because the majority, in holding that the States must yield to the Department of Education's demands, places this court's imprimatur on what I believe to be an unauthorized, if not unconstitutional, exercise of federal authority over matters peculiarly within the province of the States and reserved to them by the Tenth Amendment to the Constitution, I dissent.

I.

A.

The Secretary of Education and the Assistant Attorney General acknowledge, as they must, that IDEA at most only implicitly conditions the States' receipt of funds upon the continued provision of educational services to students expelled for misconduct unrelated to their handicaps. See Decision of the Secretary, Proposed Withholding Proceeding, Docket No. 94-76-0, at 5 (July 3, 1995) ("[T]he IDEA does not contain explicit language which precludes the cessation of education services for disabled children who are suspended long-term or expelled for misconduct unrelated to their disability."); Respondent's Br. at 34, 35 n.11 (conceding that the condition the Secretary seeks to impose is only "implicit"). Because we are here concerned with a congressional conditioning of the States' receipt of federal funds, this acknowledgment is itself sufficient basis upon which to reject the Federal Government's argument that the States are required to continue providing educational services to these expelled students, as I discuss infra. For, in order for the States to be bound by a condition upon the receipt of federal monies, the Congress must have affir-

7

matively imposed that condition in clear and unmistakable statutory terms. An adjustment to the critical balance of power between the Federal Government and the States cannot be authorized implicitly.

But, before turning to the question of whether IDEA satisfies the heightened standard applicable to federal statutes that affect the distribution of power between the Federal Government and the States, it should be understood that IDEA does not impose, implicitly or otherwise, the condition for which the Federal Government argues, under even ordinary standards of statutory construction. The relevant provision of the IDEA does not require that the States have in effect "a policy that assures all handicapped children a free appropriate public education" -- a condition which, in my view, still would not require the States to provide education to handicapped children expelled for misconduct having nothing whatever to do with their disabilities. Rather, it requires that, in order to qualify for federal special education funds, the States "ha[ve] in effect a policy that assures all children with disabilities <u>the right to</u> a free appropriate public education." 20 U.S.C. § 1412(1) (emphasis added). Thus, as the Supreme Court has repeatedly observed, <u>see</u> discussion <u>infra</u>, the statute only requires that the States provide handicapped children with <u>access</u> to such an education. And, as with any other right, that right of access to educational services may be forfeited by criminal or other conduct antithetical to the right itself. A state, accordingly, no more fails to satisfy the statute's condition when it refuses to continue educational services to a student who has forfeited his right to such services, than when it does not provide an education to a student who chooses not to avail himself of the opportunity at all.

The majority errs in its interpretation of the statute precisely because it ignores the key phrase "the right to," and instead focuses exclusively upon the word "all." <u>See</u>, <u>e.g.</u>, <u>ante</u> at 16 n.13 ("Virginia has concentrated on the interpretation of the phrase `all children,' but we have concluded that `all' means `all' and that concentration should more appropriately be focussed on the statutory requirement of `a free appropriate public education.'"). In doing so, of course, the majority entirely begs the question we must decide in order to resolve this case. It is indisputable that, as a condition to receipt of the special education funds, the States must have in place a policy that assures "all" handicapped children something; the question is, what is that

8

something. And it could not be clearer from the face of the statute that that something is only "the right to" a free appropriate public education. If this were not evident from the statute's language, then it should be evident from the derisible result that follows upon the alternative interpretation -- that the States are required, at taxpayers' expense, to dispatch to prisons, jails, and personal residences, private tutors to instruct those students who have so disrupted the classroom that their own instruction and that of their fellow students was rendered impossible.

Of course, the Commonwealth of Virginia has in effect the precise policy required by the statute. Virginia extends to every handicapped school-age child within the Commonwealth the right to a free public education appropriate to his disabilities. What it does not do -- and understandably -- is require that local school boards discipline their handicapped students (for conduct unrelated to their disabilities) differently from their non-handicapped students, and provide educational services even to those handicapped youths who have forfeited the right to a free education by wilfully engaging in contumacious conduct so serious as to warrant the ultimate discipline of expulsion. See Regulations Governing Special Education Programs for Children with Disabilities in Virginia, § 3.3(B)(11)(b)(4) ("If there is no causal connection [between the misconduct and the disability] and if the child was appropriately placed at the time of the misconduct, the child may be disciplined the same as a nondisabled child.").[1] And nothing in the

_____

[1] Because of the procedural requirements IDEA imposes upon the States before any change in placement of a disabled student can be effected, including the requirement that the States prove that the misconduct was wholly unrelated to the student's disability, expulsion of a disabled student actually is, as a practical matter, considerably more difficult than expulsion of a non-handicapped student. See, e.g., 20 U.S.C. §§ 1415(b)(1)(D), 1415(b)(1)(E), 1415(b)(2), 1415(c), 1415(e)(2); Board of Educ. v. Rowley, 458 U.S. 176, 182 (1982) ("[T]he Act imposes extensive procedural requirements upon States receiving federal funds under its provisions.").

As the Commonwealth recounts the process attending the expulsion of one handicapped student:

> 1. Student with Attention Deficit/Hyperactivity Disorder "ADHD" brought knife to school hidden in his boot. The knife

language of IDEA even purports to condition the Commonwealth's receipt of IDEA's special education funds upon the State's submission to the Federal Government's inexplicable demand that it now do so.

Nor does anything in the purpose of IDEA suggest that the State is required to succumb to the Federal Government's demands. The express, codified purpose of the IDEA is "to assure that all children with disabilities have available to them . .. a free appropriate public education which emphasizes special education and related services designed to meet their unique needs . . . [and] to assist States and localities to provide for the education of all children with disabilities. . . ." 20 U.S.C. § 1400(c) (emphasis added). As the Supreme Court

_____

was reported by a female student who alleged he had brought the knife on other occasions and had threatened to stab her. When questioned he denied having the knife, refused to untie his boot, told officials they had no right to search him, but eventually surrendered the knife. The student knew the consequences of being discovered would probably be expulsion.

2. The first causality committee concluded there was no causal connection between the conduct and the disability.

3. The parents sought reconsideration and a second causality committee was convened. It concluded there was no causal relationship.

4. A discipline review committee was then held to review the recommended long-term suspension. This committee upheld the long-term suspension.

5. Parents sought a "due process" hearing.

6. First level hearing officer found no causal connection.

7. Second level hearing officer also found no causal connection.

8. The incident occurred when the student was 15 and, despite the IDEA-B stringent time-lines, the due process appeals took eight months.

Petitioner's Br. at 36 n.21. Even after these procedural steps were taken, the parents and the disabled student still had the right to challenge the disciplinary action in state or federal court. See 20 U.S.C. § 1415(e)(2).

10

has recognized, the statute's purpose was to ensure that disabled students are not denied access to a free public education because of their disabilities, or because of misconduct related to their disabilities. See Board of Educ. v. Rowley, 458 U.S. 176 (1982) (referring repeatedly to the purpose of the Act as one giving handicapped children access to public education); id. at 214 (White, J., dissenting) ("[T]he Act intends to give handicapped children an educational opportunity commensurate with that given other children.");[2] Honig v. Doe, 484 U.S. 305 (1988). The statute was enacted "to open the door of public education" to handicapped students, Rowley, 458 U.S. at 192, one million out of eight million of whom had been excluded from school systems across the country because of their disabilities, id. at 189, many through the pretextual use of discipline, see Honig, 484 U.S. at 324.

Not only is there nothing in this laudable purpose of IDEA that would require the continued provision of educational services to handicapped students expelled for reasons unrelated to their handicap, the statutory purpose is fully achieved by interpreting the language so as not to require such, thereby reserving to the States, in the manner urged by the Commonwealth, their historical responsibility for the discipline of their schoolchildren. As even the Ninth Circuit held in Doe v. Maher, 793 F.2d 1470 (9th Cir. 1986), aff'd as modified sub nom., Honig v. Doe, 484 U.S. 305 (1988), in a portion of its opinion notably left undisturbed by the Supreme Court in Honig:[3]

_____

[2] **See also Rowley**, 458 U.S. at 199 (referring to caselaw upon which Congress expressly relied in enacting IDEA as enunciating a "right of access to free public education"); id. at 200 ("[N]either the Act nor its history persuasively demonstrates that Congress thought that equal protection required anything more than equal access."); id. ("Desirable though [the goal of maximizing each handicapped child's potential] might be, it is not the standard that Congress imposed upon States which receive funding under the Act. Rather, Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education.").

[3] Although the Department of Justice maintains that Honig effectively decided the question we confront, the Secretary of Education, as does even the majority, recognizes that it did not. See Decision of the Secretary, supra, at 6 (noting that an expulsion for conduct unrelated to disability is "the circumstance left unaddressed by Honig"); ante at 17

11

> If the child's misbehavior is properly determined <u>not</u> to be a manifestation of his handicap, the handicapped child can be expelled. This conclusion does not conflict with the [IDEA]. When a child's misbehavior does not result from his handicapping condition, there is simply no justification for exempting him from the rules, including those regarding expulsion, applicable to other children. <u>Therefore, when a handicapped child is properly expelled, the school district may cease providing all education services -- just as it could in any other case.</u> To do otherwise would amount to asserting that all acts of a handicapped child, both good and bad, are fairly attributable to his handicap. We know that that is not so.

<u>Id</u>. at 1482 (emphasis added, footnote and citations omitted); <u>see also</u> <u>Doe</u> v. <u>Board of Educ.</u>, 1996 WL 79411, at *3-4 (N.D. Ill. Feb. 16, 1996);**4** <u>Doe</u> v. <u>Koger</u> , 480 F. Supp. 225, 229 (N.D. Ind. 1979).

_____

("[U]pholding the Secretary's decision in the case at bar is <u>consistent with</u> the Supreme Court's ruling in <u>Honig</u> v. <u>Doe</u>." (emphasis added)); <u>see also Metropolitan School District</u> v. <u>Davila</u>, 969 F.2d 485, 493 (7th Cir. 1992) ("<u>Honig</u> did not reach this issue."), <u>cert</u>. <u>denied</u>, 507 U.S. 949 (1993). The Court in <u>Honig</u> addressed only the question of whether school districts could unilaterally change the placement of disabled students for "dangerous or disruptive conduct growing out of their disabilities." 484 U.S. at 308; <u>see also id</u>. at 312 ("The present dispute grows out of the efforts of [school officials] to expel two emotionally disturbed children from school indefinitely for violent and disruptive conduct <u>related to their disabilities</u>." (emphasis added)). To the extent that the Court's opinion can be read to speak to the issue now before us, it suggests, given the Ninth Circuit's holding quoted above, that the States are <u>not</u> required to continue to provide educational services to students expelled for conduct unrelated to their handicaps. <u>Id</u>. at 328.

**4** The district court in <u>Doe</u> subsequently agreed to reconsider its decision, noting that the Department of Education's contrary interpretation of the statute, of which it had only recently become aware, was entitled to deference. <u>See</u> 1996 WL 197690, at *2 (N.D. Ill. Apr. 22, 1996). As I explain <u>infra</u>, because of the applicability of the "clear statement" rule, the deference that we ordinarily afford agency interpretations of ambiguous statutes is inapplicable in a case such as this. Thus, I would expect the district court's original decision to be reaffirmed.

That the Department of Justice, in what is emerging as a pattern of deceptively selective quotation that threatens to undermine in this court and others the traditional respect accorded the Department, see, e.g., Thomasson v. Perry, 80 F.3d 915, 939-41 (4th Cir. 1996) (Luttig, J., concurring), believes it necessary to omit the phrase "the right to" on virtually every occasion when it recites the statute's requirement that the States "assure[ ] all children with disabilities the right to a free appropriate public education,"**5**  only confirms that it likewise understands that Congress has not conditioned the States' receipt of federal funds upon the continued provision of education to expelled students, or, at the very least, that it understands Congress has not done so with the clarity required for the appropriation of a core state function. There would be no other reason for such intentional omission of these three manifestly relevant (even if, in one's view, not dispositive) words from the short, thirteen-word provision before us.

B.

Whether the majority's interpretation of the statute or that which I believe Congress intended is the better, however, is not even the

_____

**5** In the first substantive sentence of its "Summary of Argument," for example, the Assistant Attorney General writes that,"[t]he IDEA unambiguously requires participating states, as a condition of receiving federal funds, to assure that a free appropriate public education is provided to `all children with disabilities.'" Respondent's Br. at 15 (selectively quoting 20 U.S.C. § 1412(1)). In the first sentence of its "Argument," the Assistant Attorney General, again selectively quoting from section 1412(1), claims that "[t]he language of the IDEA is unambiguous: participating states must assure that a free appropriate public education is available to `all children with disabilities.'" Id. at 17. And throughout the Department's submissions, the same omission is made. See id. at 16 ("[T]he statute mandates provision of special educational services to `all' children with disabilities."); id. at 25 ("[Congress] has declined to override the IDEA's mandate that special education services be provided to all children with disabilities."); id. at 34 ("[The condition] is necessarily implicit in the IDEA's requirement that a free appropriate public education be provided to all children with disabilities."); id. at 36 ("The requirement that states provide special education services to all children with disabilities, including those under disciplinary suspension or expulsion, is clear and specific.").

13

question. The question is whether, <u>in unmistakably clear terms</u>, Congress has conditioned the States' receipt of federal funds upon the provision of educational services to those handicapped students expelled for misconduct unrelated to their handicap:"[I]f Congress desires to condition the States' receipt of federal funds, it `must do so unambiguously . . . .'" <u>South Dakota</u> v. <u>Dole</u>, 483 U.S. 203, 207 (1987) (quoting <u>Pennhurst State Sch. & Hosp.</u> v. <u>Halderman</u>, 451 U.S. 1, 17 (1981)).**6** Indeed, the Supreme Court itself invoked <u>Pennhurst</u>'s clear statement rule in addressing the identical provision of the IDEA at issue here, reasoning that it is a"fundamental proposition that Congress, when exercising its spending power, can impose no burden upon the States unless it does so unambiguously." <u>Rowley</u>, 458 U.S. at 190 n.11 (citing <u>Pennhurst</u>, 451 U.S. at 17). If Congress has not unequivocally conditioned receipt of federal funds in the manner claimed by the Department of Education, and by the Department of Justice on its behalf, then our inquiry is at an end.

Insistence upon a clear, unambiguous statutory expression of congressional intent to condition the States' receipt of federal funds in a particular manner is especially important where, as here, the claimed condition requires the surrender of one of, if not the most significant of, the powers or functions reserved to the States by the Tenth Amendment -- the education of our children. <u>See</u>, <u>e.g.</u>, <u>Honig</u>, 484 U.S. at 309 ("[E]ducation [is] `perhaps the most important function of

---

**6 Cf. Will** v. <u>Michigan Dep't of State Police</u>, 491 U.S. 58, 65 (1989) (describing as an "ordinary rule of statutory construction" the principle that "if Congress intends to alter the `usual constitutional balance between the States and the Federal Government,' it must make its intention to do so `unmistakably clear in the language of the statute.'" (quoting <u>Atascadero State Hosp.</u> v. <u>Scanlon</u> , 473 U.S. 234, 242 (1985), and citing <u>Pennhurst</u>, 465 U.S. at 99)); <u>Gregory</u> v. <u>Ashcroft</u>, 501 U.S. 452, 460 (1991) ("[Where] [c]ongressional interference [with a core state function] would upset the usual constitutional balance of federal and state powers[,] . . . `it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' this balance." (quoting <u>Atascadero</u>, 473 U.S. at 243, and citing <u>Pennhurst</u>, 465 U.S. at 99)); <u>Torcasio</u> v. <u>Murray</u>, 57 F.3d 1340, 1344-46 (4th Cir. 1995) (holding that "Congress must speak unequivocally before [courts] will conclude that it has `clearly'" intruded upon core state functions), <u>cert.</u> <u>denied</u>, 116 S. Ct. 772 (1996).

14

state and local governments.'" (quoting Brown v. Board of Educ., 347 U.S. 483, 493 (1954))); Milliken v. Bradley, 418 U.S. 717, 741 (1974) ("No single tradition in public education is more deeply rooted than local control over the operation of schools . . . ."); United States v. Lopez, 115 S. Ct. 1624, 1632 (1995) ("[Education is an area] where States historically have been sovereign."). In this context, we in the judiciary labor under a special obligation to "assure[ ] that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." United States v. Bass, 404 U.S. 336, 349 (1971); see also, e.g., Gregory, 501 U.S. at 461 (quoting Bass); Will, 491 U.S. at 65 (same); Torcasio, 57 F.3d at 1344 (same).

The Department of Justice argues, in what I understand as a concession, and the majority accepts, in what I understand as an admission, that in the event of ambiguity in the IDEA provision at issue, we defer to a reasonable interpretation by the agency, as if we were interpreting a statute which has no implications for the balance of power between the Federal Government and the States. **7** We do not. It is axiomatic that statutory ambiguity defeats altogether a claim by the Federal Government that Congress has unambiguously conditioned the States' receipt of federal monies in the manner asserted. As the Court stated in Gregory v. Ashcroft :

> [I]nasmuch as this Court in Garcia[v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985)] has left primarily to the political process the protection of the States against intrusive exercises of Congress' Commerce Clause powers, we must be absolutely certain that Congress intended such an exercise. "[T]o give the state-displacing weight of federal law to mere congressional ambiguity would evade the very procedure for lawmaking on which Garcia relied to protect states' interests."

_____

**7 See ante** at 8 n.4 (citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843-45 (1984)); cf. Respondent's Br. at 26 ("Even if the statute were ambiguous on this point, however, the Secretary's interpretation of the statute's requirements is reasonable and entitled to substantial deference."); id . at 16 ("The only issue is whether the Secretary's interpretation of [section 1412(1)] is reasonable.").

501 U.S. 452, 464 (1991) (quoting L. Tribe, American Constitutional Law § 6-25, p. 480 (2d ed. 1988)).

Applying the clear statement rule with the required solicitude for the rights of the States in our federalist system, it is apparent that Congress has not spoken through the IDEA with anywhere near the clarity and the degree of specificity required for us to conclude that the States' receipt of special education funds is conditioned upon their continued provision of education to handicapped students expelled for criminal activity or other misconduct unrelated to their disabilities. The majority is unable to cite to a single word from the statute or from the legislative history of IDEA evidencing that Congress even considered such a condition, much less that it confronted the possibility of such a condition and its implications for the sovereignty of the States, and determined to condition the States' funds in this manner. As the Departments of Education and Justice themselves acknowledge, at most the statute implicitly conditions the receipt of funds in the manner they contend. And, as I explain above, it does not even do this; indeed, the better interpretation of the statutory language is that Congress only required the States to provide handicapped children with access to an education, reserving to the States -- intentionally or otherwise -- the authority to discipline handicapped students as they deem appropriate, for criminal actions and misconduct unrelated in any way to those students' disabilities.

The majority appears to believe that merely because section 1412 indisputably sets forth conditions on the States' receipt of IDEA funds, see 20 U.S.C. § 1412 ("In order to qualify for assistance under this subchapter in any fiscal year, a State shall demonstrate to the Secretary that the following conditions are met: . . ." (emphasis added)), Congress has ipso facto spoken sufficiently clearly to satisfy the clear statement requirement. However, in Gregory, the Supreme Court rejected this very understanding of the clear statement requirement in a holding that should control the disposition of the case before us. There, the Court held that the Age Discrimination in Employment Act, which covered employees of "a State or political subdivision of a State," 29 U.S.C. § 630(b)(2) -- a provision that under today's majority opinion would seem unambiguously to cover state judges, did not apply to state judges because the provision did not unambiguously reveal that Congress intended such a result. In reaching this

16

conclusion, the Court reasoned that a clear statement is required not simply in determining whether a statute applies to the States, but also in determining whether the statute applies in the particular manner claimed. Gregory, 501 U.S. at 460-70. In fact, Justices White and Stevens declined to join the "clear statement" discussion in Justice O'Connor's opinion for the Court because it adopted the position urged by the Commonwealth and rejected by the majority in this case:

> [T]he majority nevertheless imposes upon Congress a "plain statement" requirement. The majority claims to derive this requirement from the plain statement approach developed in our Eleventh Amendment cases . . . . The issue in those cases, however, was whether Congress intended a particular statute to extend to the States at all. . . . In the present case, by contrast, Congress has expressly extended the coverage of the ADEA to the States and their employees. Its intention to regulate age discrimination by States is thus"unmistakably clear in the language of the statute." Atascadero, [473 U.S.] at 242. . . . The only dispute is over the precise details of the statute's application. We have never extended the plain statement approach that far . . . .

Id. at 475-76 (White, J., concurring in part, dissenting in part, and concurring in the judgment); cf. id. at 493 (Blackmun, J., joined by Justice Marshall, dissenting) (arguing that Chevron deference, rather than clear statement rule, was appropriate).

Since neither the text of section 1412(1), the legislative history, nor the purpose of the IDEA even suggests, much less mandates with the clarity necessary to confirm that the Congress actually confronted and deliberately decided, that a state must continue to provide education services to disabled children after expulsion for misconduct unrelated to their disabilities, I would reject the Department of Education's new interpretation to the contrary as ultra vires .**8** I would hold that the

_____

**8** The Department of Education did not even arrive at the interpretation of section 1412(1) that it advances in this litigation until 1989, fifteen years after passage of IDEA. See, e.g., Virginia Dep't of Educ. v. Riley, 23 F.3d 80, 85-86 (4th Cir. 1994) (describing the Department's 1989

17

Commonwealth of Virginia fulfills its statutory obligations under section 1412(1) by affording all disabled students the right to a free appropriate public education -- a right that disabled students, like non-disabled students, can forfeit by criminal activity or serious misconduct unrelated to their disabilities.[9] While the States are free, in Faustian fashion, to surrender unto the Federal Government that which separately defines them as powers autonomous from that Government, it is plain that they have not done so in this instance. Nor, for that matter, has the Congress sought to exact such an abnegation from them. Indeed, I would be astonished if the Congress of the United States was even aware that the Departments of Education and Justice are contending otherwise before this court.

## II.

Because I interpret section 1412(1) of IDEA so as not to impose

_____

interpretation as a "new condition" on funding); Decision of the Secretary, <u>supra</u>, at 1 n.1 (referring to the 1989 interpretation as a "`new condition' of compliance"); <u>id</u>. ("The Hearing Officer also found that the Department's enforcement of IDEA-B, <u>while neither uniform nor constant, was not arbitrary or capricious</u> . . . ." (emphasis added)).

[9] I would categorically reject the Department's byzantine alternative argument, which it briefed but abandoned at oral argument, that the policy outlined in the Department's interpretive letter has itself been incorporated into the statute by virtue of section 314(b) of the Improving America's Schools Act of 1994, Pub. L. 103-382, <u>reprinted in</u> 20 U.S.C. § 8921 note. That uncodified section provides that the stay-put provision of the IDEA "shall be interpreted in a manner that is consistent with the Department's final guidance concerning State and local responsibilities under the Gun-Free Schools Act of 1994." 20 U.S.C. § 8921 note. The portion of the guidance memorandum upon which the United States relies, interprets other provisions of the IDEA, not the stay-put provision. <u>See</u> U.S. Dep't of Educ., Guidance Concerning State and Local Responsibilities Under the Gun-Free Schools Act of 1994, at 3, <u>reprinted in</u> J.A. at 219 ("[T]he IDEA requires that educational services must continue, although they may be provided in another setting, for students with disabilities who are properly expelled."). Accordingly, this portion of the Department of Education's memorandum has not been elevated to statutory law.

18

upon the States the condition that they provide private tutors and other alternative educational services to handicapped students expelled for egregious conduct unrelated to their disabilities, I need not resolve the Tenth Amendment issue that is presented upon the contrary reading of the statute. Suffice it to say, however, that I regard that issue as considerably more substantial than does the majority, which all but rejects it out of hand.

I recognize that the Court has not invalidated an Act of Congress under the Spending Clause since United States v. Butler, 297 U.S. 1 (1936), over half a century ago. But cf. United States v. Lopez, 115 S. Ct. 1624 (1995); Seminole Tribe v. Florida, 116 S. Ct. 1114 (1996). However, as Chief Justice Rehnquist, on behalf of the Court, recently reminded in South Dakota v. Dole, 483 U.S. 203 (1987), "[the Court's] decisions have recognized that in some circumstances the financial inducement offered by Congress might be so coercive as to pass the point at which `pressure turns into compulsion,'" id. at 211 (quoting Steward Machine Co. v. Davis , 301 U.S. 548, 590 (1937)), "in contravention of the Tenth Amendment or of restrictions implicit in our federal form of government," Steward Machine Co., 301 U.S. at 585.

The Court in Dole rejected South Dakota's argument that the Federal Government's condition that the State raise its drinking age for all consumers to 21 was impermissibly coercive. In that case, however, Congress had directed that the States "lose[only] a relatively small percentage of certain federal highway funds" for their noncompliance. 483 U.S. at 211. Because "all South Dakota would lose if she adhere[d] to her chosen course as to a suitable minimum drinking age [was] 5% of the funds otherwise obtainable" under the program, the Court concluded that Congress had but "offered relatively mild encouragement to the States to enact higher minimum drinking ages." Id.

Here, in stark contrast, the Federal Government has withheld from the Commonwealth 100% of an annual special education grant of $60 million because of the Commonwealth's failure to provide private educational services to less than one-tenth of one percent (126) of the 128,000 handicapped students for whom the special education funds were earmarked. And it has withheld the entirety of this $60 million

19

grant -- only $58,000 of which would, on a pro rata basis, be available for educational services to the 126 expelled students -- because the State refused to surrender control over its own classrooms and schoolchildren by abandoning one of its most effective tools for maintaining order and discipline, see, e.g. , Goss v. Lopez, 419 U.S. 565, 580 (1975) ("Suspension is considered not only to be a necessary tool to maintain order but a valuable educational device."). As even the Department of Education concedes, under the interpretation of the statute embraced by the court today, "Congress[has] drastically curtailed local autonomy with respect to discipline and denial of educational services to this group of children" "[a]s a condition of receiving federal funds." Respondent's Br. at 38.

This is a condition considerably more pernicious than the "relatively mild encouragement" at issue in Dole . Withholding the $58,000 pro rata amount of the funds that would be used by the State to provide services to the 126 expelled students whom the Federal Government believes are entitled to educational services under the statute would be "encouragement." The withholding of almost $60 million from the State and from the 128,000 disabled students who have responsibly availed themselves of their educational opportunity, simply because the State refuses to yield to the federal demands as to the 126 students who have abused their rights, begins to resemble impermissible coercion, see Dole, 483 U.S. at 211, if not forbidden regulation in the guise of Spending Clause condition, as well, see id. at 212, 215-218 (O'Connor, J., dissenting); Butler, 297 U.S. at 73 ("There is an obvious difference between a statute stating the conditions upon which moneys shall be expended and one effective only upon assumption of a contractual obligation to submit to a regulation which otherwise could not be enforced.").

Neither of the majority's two efforts to escape the import of Dole's reasoning succeeds. The percentage of the total monies expended by the State for education of the handicapped that is represented by the federal grant is irrelevant in assessing the coerciveness of the inducement, at least as appears from the Court's opinion in Dole. Were it otherwise, the same federal grant in the same amount would be unconstitutionally coercive as to one State, but not as to another which expends a greater amount for the purposes served by the grant; indeed, were it otherwise, there would be created a perverse incentive

20

for the States to spend less in areas in which they expected to receive federal monies, in order to render more vulnerable under the coercion theory any conditions that were imposed. Thus, the majority's effort to compare the 100% withholding here to the 5% withholding in Dole, by noting that the $60 million in special education funds constitutes only "approximately five percent of the funds needed to educate Virginia's disabled children," ante at 23; compare Respondent's Br. at 43 (claiming that the federal grant "provides at most nine percent of the cost of providing special educational services to children with disabilities"), is to no avail. Equally unavailing is the majority's effort to avoid the import of Dole by observing that a 100% withholding of a "mere $1,000" education grant would not be unduly coercive. The difference between a $1000 grant and, as here, a $60 million grant, insofar as their coercive potential is concerned, is self-evident.

The argument made by counsel for the Department of Justice is no more responsive to the constitutional barrier recognized by Dole than are the majority's. In contending that the withholding is not coercive, counsel emphasized that there were more coercive steps that might have been taken, such as the withholding of all federal funds from the Commonwealth. Sending in the troops would be more coercive still, but the existence of that more coercive alternative does not render the withholding to which the Commonwealth is subject noncoercive.

Ultimately, if the Court meant what it said in Dole, then I would think that a Tenth Amendment claim of the highest order lies where, as here, the Federal Government (accepting the majority's interpretation of the statute) withholds the entirety of a substantial federal grant on the ground that the States refuse to fulfill their federal obligation in some insubstantial respect rather than submit to the policy dictates of Washington in a matter peculiarly within their powers as sovereign States. In such a circumstance, the argument as to coercion is much more than rhetoric; it is an argument of fact. See Dole, 483 U.S. at 211. It is, as well, an argument that the Federal Government has, in an act more akin to forbidden regulation than to permissible condition, supplanted with its own policy preferences the considered judgments of the States as to how best to instill in their youth the sense of personal responsibility and related values essential for them to function in a free and civilized society. As such, it is an argument well-grounded in the Tenth Amendment's reservation "to the States

21

respectively, or to the people" of those "powers not delegated to the United States by the Constitution, nor prohibited by it to the States."

* * * * *

In the end, this case is about the permissible reach of federal power under the Spending Clause in a time when the several States have become increasingly dependent upon the Federal Government for funds, because the Federal Government has increasingly become dependent upon the revenues from taxation it receives from the citizens of the several States. In particular, it is about the extent to which the Federal Government may, in our system of federalism, impose its policy preferences upon the States by placing conditions upon the return of revenues that were collected from the States' citizenry in the first place. As Justice O'Connor aptly observed in Dole:

> If the spending power is to be limited only by Congress' notion of the general welfare, the reality, given the vast financial resources of the Federal Government, is that the Spending Clause gives "power to the Congress to tear down barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such as are self-imposed." [Butler , 297 U.S. at 78]. This, of course, as Butler held, was not the Framers' plan and it is not the meaning of the Spending Clause.

483 U.S. at 217.

According to counsel for the Department of Education, requiring the States to continue to provide educational services to handicapped students expelled for reasons unrelated to their handicaps "make[s] sense, as a matter of policy, in light of the broad purposes of the statute[,] . . . [and] allow[ing] individual school districts in their sole discretion to decide whether or not to deny services to this significant number of children with disabilities . . . would . .. inflict lasting harm on these children."

The Commonwealth of Virginia, for its part, steadfastly maintains not only that the Department's policy is misguided, because it

22

deprives the State of its most effective disciplinary and instructional tool for instilling in its especially recalcitrant students the sense of responsibility they so sorely lack, but that it is, in any event, a policy decision uniquely reserved to the States by the Constitution. And the wisdom of the Commonwealth's policy is certainly borne out by the testimony of the State's local educators and administrators. In testimony that speaks volumes, Jane Timian, the Hearing and Legal Assistant for the Fairfax County School Board responsible for overseeing all student disciplinary matters, described as follows two illustrative incidents that have recently taken place in the Commonwealth as a consequence of the Education Department's policy:

> In a recent case at one of FCPS' 23 high schools, six students were part of a group of students whose actions resulted in a loaded .357 magnum handgun being recovered in the school building. The non-special education students were expelled. One student, however, was identified as "learning disabled" due to the student's weakness in written language skills. An IEP team reviewed extensive evaluations and unanimously found no causal relationship between the student's writing disability and the student's involvement in the weapons violation. The student was not expelled. The student later bragged to teachers and students at the school that he could not be expelled.

> In another recent case at a different high school, a student gang which had adopted a specific name was involved in a mob assault of another student. One student involved in the melee used a meat hook as a weapon. Three of the gang members were expelled. The other two members of the gang were special education students who have not been expelled and who are still receiving services.

J.A. at 177. And confirming what anyone even remotely familiar with public education today would have expected, Lucille Brown, Superintendent of Richmond City Public Schools, testified that the "`home-bound instruction' and `alternative education'[after expulsion]" that has been required by the Federal Government's Department of Education has "become just another `badge of honor' flaunted by students who have bested the public schools again." Petitioner's Br. at 10.

23

In our federal system of government, such delicate policy decisions, relating so intimately as they do to matters within the exclusive prerogative of the States, are presumed to be those of the States alone. If the Federal Government intends to expropriate these or other sovereign rights from the States, it must at least do so affirmatively and unambiguously, so that its design is known and the States may marshal their political will in opposition to that expropriation. Even then, of course, the Federal Government must effectuate that expropriation in a manner that is faithful to the limitations on Federal power that inhere in the Tenth Amendment and in the principles of federalism that undergird our entire democratic system of governance. Only when the Government acts within these limitations can one have confidence both that the United States has deliberately determined to subordinate the rights of the States to the interests of the Federal Government and that it has done so consistently with the constitutional limitations that even today constrain the Federal Government as against the People.

In my view, certainly the first, and perhaps the second, of these essential limitations on Federal power has been exceeded in the IDEA provision, at least as it is interpreted by the court today. And with these excesses has come, as always, yet a further incremental, but no less significant, incursion into the sovereign authority of the several States. As counsel for the Federal Government responded, after reflecting for a moment on the court's question whether the Department of Education was not simply saying to the States that it knows better than they what is good for America's schoolchildren and then imposing that view on the States: "Well your honor, in a sense, that's what Congress is doing in this whole statute." Unwilling to acquiesce in such a pretentious arrogation of state power, I dissent.

_____

NIEMEYER, Circuit Judge, concurring in part:

I concur in part I of the opinion adopted by the majority and in the judgment of the court.

_____

24

HAMILTON, Circuit Judge, concurring in the judgment:

Because Part I of the majority opinion, with which I am in complete accord, adequately disposes of the matter, I would not reach the Tenth Amendment analysis. Accordingly, I concur in Part I of the majority opinion and in the judgment of the court.

Judge Ervin has joined this opinion.

_____

MICHAEL, Circuit Judge, concurring in the judgment:

Because I agree with the point in the majority's adopted opinion that the right here can be forfeited, I concur in the judgment.

_____

DIANA GRIBBON MOTZ, Circuit Judge, concurring in the judgment:

For many of the reasons explained in Part I of Judge Luttig's dissent from the opinion of the panel majority, I do not believe Congress has unambiguously required the states to provide educational services to disabled children who have been suspended or expelled for misconduct unrelated to their disabilities. Accordingly, I join the court's judgment.

_____

MURNAGHAN, Circuit Judge, dissenting:

The majority opinion rests on a conclusion which I find unacceptable:

> [T]he statute [IDEA] only requires that States provide handicapped children with access to such an education. And, as with any other right, that right of access to educational services may be forfeited by criminal or other conduct antithet-

25

ical to the right itself. A state, accordingly, no more fails to satisfy the statute's condition when it refuses to continue educational services to a student who has forfeited his right to such services, than when it does not provide an education to a student who chooses not to avail himself of the opportunity at all.

86 F.3d at 1349.

The case actually concerns the meaning to be given to the words "a policy that assures all children with disabilities the right to a free appropriate public education." I have found that they unambiguously convey a meaning. My colleague, Judge Hall, also dissenting, alternatively reasons that, even if there is ambiguity, following Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837 (1985), would lead to the same meaning I have reached. Simply put I regard "all children" as reaching to the all encompassing height, put algebraically at 10. Judge Hall, on his assumption of ambiguity, gives the ambiguous language supposed to exist only an 8 but then ascribes at least a 2, bringing the total to 10 because of the Secretary of Education's construction of the statutory language. The majority reaches a contrary conclusion, namely, that the statute unambiguously means what it does not say. The majority argues that "all children" is meant not to encompass children with disabilities who have been expelled or suspended. Following from that conclusion, the majority concludes that such expelled or suspended children lose their rights to a free appropriate public education when their misconduct is unrelated to their disabilities. The majority thereby invents an unmentioned forfeiture to justify interpreting "all children" not to include disabled children who are suspended or expelled for misconduct unrelated to their disabilities. Thereby the algebraic figure is required to become materially less than 10.

Similarly, with the same object in mind, the words "access," "assures" and "right" are reduced in meaning by imagining a limitation not expressed in IDEA excluding from assurance of the right to a free appropriate public education those children with disabilities who are expelled or suspended for misconduct unrelated to their disabilities. That also reduces further below 10 the value clearly applying to "all children."

26

I.

My disagreement with the majority's disposition of the instant case stems from its notion that the right provided by the IDEA is forfeitable. For the remarkable proposition it has come to, the majority does not cite to any provision of the IDEA to support its belief that the disabled child can forfeit his right to a free appropriate public education guaranteed by the statute. At issue in the instant case is a group of 126 children with disabilities who have been expelled and to whom Virginia has ceased providing educational services during the expulsion period. Those expelled children are not the only ones interested. The public generally will suffer from the denial of a free public education in the case of a child already handicapped.

Under the majority's view, the 126 children affected by Virginia's policy have "forfeited" their right to a free appropriate public education. The majority interprets the phrase "[t]he State has in effect a policy that assures all children with disabilities the right to a free appropriate public education," as creating only a "right of access" to such education, not as creating a federal right to receive educational services under the IDEA. Adoption of the latter, the majority opines, would require States:

> at the taxpayers' expense, to dispatch to prisons, jails, and personal residences, private tutors to instruct those students who have so disrupted the classroom that their own instruction and that of their fellow students was rendered impossible.

83 F.3d at 1349.

Despite the fact that the majority's view adopts the most extreme example, unsupported by the record, to make its point, it is axiomatic that a statute establishing a right may also specify under what circumstances that right may be forfeited. Congress, however, in enacting the IDEA has specified no circumstances under which a disabled child may lose by forfeiture the right to educational services under the IDEA, whether that be the federal right to a free appropriate public

27

education, or the "right of access" to a free appropriate public education as created by the majority.[1]

In <u>Burlington School Committee v. Massachusetts Department of Education</u>, 471 U.S. 359 (1985), the Supreme Court addressed the issue of waiver of reimbursement under the Education of the Handicapped Act (EHA).[2] As the Court recognized the EHA requires participating states and local educational agencies "to assure that handicapped children and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education" to such handicapped children. In <u>Burlington</u>, the parents of a handicapped child rejected the schools' Individualized Educational Program (IEP) for their son and placed him in a private school without the consent of the local school authorities, in violation of § 1415(e)(3) of the Act. Thereafter, the parents sought reimbursement of the costs associated with the private school. The school authorities argued that the parents had waived their right to reimbursement by violating § 1415(e)(3). Section 1415(e)(3) provided that while administrative proceedings are pending about the child's placement, "the child shall remain in the then current educational placement."

The Supreme Court disagreed. The Court reasoned that § 1415(e)(3) "says nothing about financial responsibility, waiver, or parental rights to reimbursement at the conclusion of judicial proceed-

_____

[1] Virginia does provide alternative educational services through various state and local programs to many non-disabled children who are expelled from school pursuant to the Comprehensive Services Act (CSA). Those services, however, are not appropriate for a disabled child, and to the extent that such services exist, the majority's concern, undergirding its analysis, that Virginia will be burdened by requiring for disabled students, is dissipated greatly by Virginia's provisions of such services to non-disabled children.

Furthermore, it should be obvious to all, and especially was to members of Congress, that education, though rarely through private tutors, will improve the circumstances in which we all live especially if disabled children are not cut off from the considerable benefits of a public education.

[2] Precursor to Individuals with Disabilities Education Act (IDEA).

ings. Moreover, if the provision is interpreted to cut off parental rights to reimbursement, the principal purpose of the Act will in many cases be defeated in the same way as if reimbursement was never available." Id. at 372. The Court continued that:

> Thus, under the Town's reading of § 1415(e)(3), the parents are forced to leave the child in what may turn out to be an inappropriate educational placement or to obtain appropriate placement only by sacrificing any claim for reimbursement. The Act was intended to give handicapped children both an appropriate education and a free one; it should not be interpreted to defeat one or the other of those objectives.

Id. at 372. A similar approach in the instant case is necessary to insure a principal purpose of IDEA.

The Court did note, however, that "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of the state or local school officials, do so at their own financial risk. If the courts ultimately determine that the IEP proposed by school officials was appropriate, the parents would be barred from obtaining reimbursement for any interim period in which their child's placement violated § 1415(e)(3)." Id. at 373-74. See also Hudson by and Through Tyree v. Wilson, 828 F.2d 1059, 1064 (4th Cir. 1987) (relying on Burlington, "[i]t is now well settled that parents may be entitled to tuition reimbursement despite their unilateral withdrawal of their child from the public school."); Hall v. Vance County Bd. of Educ., 774 F.2d 629 (4th Cir. 1985) (relying on Burlington) (rejecting school officials' argument that parents' unilateral withdrawal of child waived any right to reimbursement). Similarly, nowhere contained in the language of the IDEA does the statute provide for the forfeiture or waiver of a disabled child's right to a free appropriate public education.

While not speaking in terms of forfeiture, in Doe v. Maher, 793 F.2d 1470 (9th Cir. 1986), aff'd as modified sub nom. Honig v. Doe, 484 U.S. 305 (1988), the Ninth Circuit affirmed the district court's finding that two plaintiffs with emotional disturbances had been improperly expelled for misconduct related to their disabilities.

29

<u>Maher</u>, 793 F.2d at 1481-82. In a passage, properly characterized as dictum, the Ninth Circuit stated:

> If a child's misbehavior is properly determined <u>not</u> to be a manifestation of his handicap, the [disabled] child can be expelled. This conclusion does not conflict with the[IDEA]. When a child's misbehavior does not result from his[disabling] condition, there is simply no justification for exempting him from the rules, including those regarding expulsion, applicable to other children. Therefore, when a [disabled] child is properly expelled, the school district may cease providing all educational services -- just as it could in any other case. To do otherwise would amount to asserting that all acts of a [disabled] child, both good and bad, are fairly attributable to his handicap. We know that that is not so.

<u>Id</u>. at 1482. (internal footnote and internal citations omitted).

However, when the Supreme Court heard the appeal of the Ninth Circuit case, at issue in <u>Honig</u> was the Act's "stay-put" provision, which states that a disabled child "shall remain in [his or her] then current educational placement" until various review proceedings have been completed, unless local school officials and the child's parents agree to the contrary. 20 U.S.C. § 1415(e)(3) (Supp.1996). Two students who had been expelled due to "violent and disruptive conduct" arising from their disabilities, <u>see</u> 484 U.S. at 312-315, argued that the state could not unilaterally expel them unless those procedures were followed. The Supreme Court agreed.**3** The Court held that the language of the statute was unequivocal, and rejected the school officials' attempt "to read a dangerousness" exception into the stay-put provision. <u>Id</u>. at 323.

The Court disagreed with the school officials' contention "that Congress thought the residual authority of school officials to exclude dangerous students from the classroom too obvious for comment." <u>Id</u>. Instead, the Court reasoned as follows:

_____

**3** The Court found, though, that the issue was moot as to one of the students. 484 U.S. at 317-18.

> We think it clear . . . that Congress very much meant to strip schools of the unilateral authority they had traditionally employed to exclude disabled students, particularly emotionally disturbed students, from school. In so doing, Congress did not leave school administrators powerless to deal with dangerous students; it did, however, deny school officials their former right to "self-help," and directed that in the future the removal of disabled students could be accomplished only with the permission of the parents, or as a last resort, the courts.

Id. at 323-24. The Supreme Court did not address the Ninth Circuit's dicta.**4**

Using the persuasive rationale articulated in Honig whereby the Court refused to read a "dangerousness" exception into the Act's stay-put provision, I refuse to read a "suspension or expulsion for conduct unrelated to disability" exception into the Act's requirement that "all" disabled children be assured "the right to a free appropriate public education." Virginia has concentrated on the interpretation of the phrase "all children," but I have concluded that "all" means "all" and that concentration should more appropriately be focused on the statutory requirement of a "free appropriate public education." See Dandridge v. Williams, 397 U.S. 471, 497 (1970) (Douglas, J., dissenting) (words "all eligible individuals" in § 402(a)(1) of the [Social Security] Act. . . reveal Congress' overriding concern with meeting the needs of each eligible recipient of aid under AFDC programs) (emphasis added); Acands, Inc. v. Aetna Cas. and Sur. Co., 764 F.2d

_____

**4** Judge Luttig's panel dissent, adopted by the en banc court, notes that the Ninth Circuit's dicta was "notably left undisturbed by the Supreme Court in Honig." 83 F.3d at 1351. I find nothing notable about the Supreme Court's failure to address a point appearing only as dicta. As Judge Luttig notes, the Honig decision did not address the issue before the court in the instant case; the Honig decision only addressed "whether . . . state or local authorities may . . . unilaterally exclude disabled children from the classroom for dangerous or disruptive conduct growing out of their disabilities." Honig, 484 U.S. at 308. In fact, no dispute exists that the two students expelled in Maher were expelled because of misbehavior related to their disabilities.

31

968, 974 (3d Cir. 1985) (affirming district court's interpretation of phrase "<u>all</u> sums which [insurer] shall become legally obligated to pay. . ." to require insurer to pay <u>all</u> sums even if plaintiff's damages are caused in part in an insured period, and also caused in part during another period) (emphasis added).**5**

II.

As in <u>Burlington</u>, the majority's "exception" for the cessation of educational services for disabled children who are expelled from school for misconduct unrelated to their disabilities, contravenes not only the language of the IDEA but guts the purpose of the IDEA. In enacting the statute, Congress found that more than eight million children with disabilities existed in the United States; these childrens' special education needs were not being fully met; more than half these children did not receive appropriate educational services; one

_____

**5** Virginia relies upon <u>Doe v. Board of Educ</u>., 1996 WL 79411 (N.D. Ill. Feb. 16, 1996), presently pending before the Seventh Circuit, to support its position. In <u>Doe</u>, the district court held that "[t]he continued provision of educational services to a student who has been expelled for reasons unrelated to a disability is not expressly required by the IDEA or its regulations, nor is there any reason to believe that Congress intended to erect an impenetrable shield insulating students with disabilities from the consequences of misconduct totally unrelated to their disabilities." However, the district court granted plaintiff's motion for reconsideration reasoning that the Office of Special Education Programs (OSEP) had taken a contrary position in an opinion letter and finding "that the positions taken by OSEP are entitled to deference", mot. for recons. granted, 1996 WL 197690 (N.D. Ill. Apr. 22, 1996). Subsequently, the district court granted defendant's motion for reconsideration concluding that upon further reflection, the OSEP opinion letter was interpretative, not legislative, and as such the court was not bound by OSEP letter, and thus, found that IDEA did not require the provision of educational services for a disabled child expelled or suspended for misconduct unrelated to his or her disability), mot. for recons. granted, 1996 WL 392160 (N.D. Ill. July 11, 1996); <u>see also Doe v. Kroger</u>, 480 F.Supp. 225, 229 (N.D. Ind. 1979) (stating that IDEA "only prohibits the expulsion of [disabled] children who are disruptive because of their [disability]") (no determination had been made, however, as to whether misbehavior was related to disability).

million of these disabled children were "excluded entirely from the public school system"; many children with disabilities were participating in regular school programs which do not serve their educational needs because their disabilities were undetected; the burden of families of disabled children who often had to seek appropriate educational services at great expense and distance from their homes; given appropriate funding State and local agencies could provide effective education and related services for these children; State and local agencies had a responsibility to provide children with disabilities with an education; and "it is in the national interest that the Federal Government assist State and local efforts to provide programs to meet the educational needs of children with disabilities in order to assure equal protection of the law." See 20 U.S.C.§ 1400(b)(1)-(9) (1990 & Supp. 1996).

The purpose of the IDEA is:

> to assure that all children with disabilities have available to them, within the time periods specified in #AD8E BD# 1412(2)(B) of this title, a free appropriate public education which emphasizes special education and related services designed to meet their unique needs, to assure that the rights of children with disabilities and their parents or guardians are protected, to assist States and localities to provide the education of all children with disabilities, and to assess and assure the effectiveness of efforts to educate children with disabilities.

20 U.S.C. § 1400(c) (emphasis added). The legislative history evinces Congress' concerns and purposes in enacting the IDEA. As the Supreme Court noted in Honig, in drafting the IDEA, Congress was guided by two district court opinions[6] which "involved the exclusion of hard-to-handle disabled students." Honig , 484 U.S. at 324; see also S. Rep. No. 168, 94th Cong., 1st Sess. 6 (1975), reprinted in 1975 U.S.C.C.A.N. 1425, 1430 (discussing Mills); Board of Educ. v. Rowley, 458 U.S. 176, 194 (1982) (reference to Mills and PARC

_____

[6] **Mills v. Board of Educ. of District of Columbia**, 348 F.Supp. 866 (D.D.C. 1972), and Pennsylvania Ass'n for Retarded Children, et al. (PARC) v. Pennsylvania, 343 F.Supp. 279 (E.D. Pa. 1972).

33

"suggests that the principles which they established are the principles, which to a significant extent, guided the drafters of the Act").

Clearly, the IDEA is remedial legislation. A familiar canon of statutory construction requires courts to interpret remedial legislation, such as the IDEA, broadly to effectuate its goals and purposes. See Tcherepnin v. Knight, 389 U.S. 332, 336 (1967) ("we are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes."); Philbin v. General Elec. Capital Auto Lease, Inc., 929 F.2d 321, 323 (7th Cir. 1991) ("Title VII is remedial legislation which must be construed liberally."); Innovative Health Systems v. City of White Plains, 931 F.Supp. 222, 232 (S.D.N.Y. 1996) (quoting Civic Ass'n of the Deaf v. Giuliani, et al., 915 F.Supp. 622, 633 (S.D.N.Y. 1996) ("As a remedial statute, the [Americans with Disabilities Act] ADA must be broadly construed to effectuate its purpose.")). **7**

While recognizing the "laudable purpose", 83 F.3d at 1350, of the IDEA, nevertheless, the majority proceeds to sanction Virginia's decision to cease providing any educational services to those children with disabilities who are expelled or suspended for misconduct unrelated to their disabilities. As Congress recognized, but the majority apparently does not, educational services for disabled children are critical to the childrens' ability to have a chance at achieving the successes of their non-disabled counterparts. See S.Rep. No. 168, supra, at 9, 1975 U.S.C.C.A.N. at 1433 ("With proper education services, many [disabled children] would be able to become productive citizens, contributing to society instead of being forced to remain burdens. Others, through such [educational] services would increase their independence, thus reducing their dependence on society").

Heralding the use of expulsion as a disciplinary tool to teach children accountability and personal responsibility for their behavior, Virginia argues that the evidence establishes that an expelled student who

_____

**7** A public education's availability to all children, able and disabled alike, is obviously essential in the public's interest. That is as true or more true for disabled children, whether their violence is due to their disabilities or not. For disabled children, the statutory language pertains to "all" with no exceptions mentioned.

34

is readmitted is less likely to be expelled again. Virginia's argument, of course, ignores evidence that shows that depriving children with disabilities of educational services, who are suspended long-term or expelled, is likely to have more severe consequences than denial of educational services during a similar disciplinary period for their non-disabled counterparts.

Specifically, in the record, Kevin P. Dwyer, a certified school psychologist in the State of Maryland, testified that children with disabilities who have their education ceased experience greater difficulty with retention upon returning to school. The retention issue is not novel, and is in fact, one of the principal reasons why, as Dwyer testified, "we have 12-month school for kids that are disabled that we don't have for kids that are not disabled. That's one of the privileges of special education more. It . . . says these kids need 12 months because . . . they lose it. They lose some ground during the summer." See also Johnson v. Independent Sch. Dist. No. 4 , 921 F.2d 1022, 1026-1030 (10th Cir. 1990) (IDEA requires year-round program when necessary), cert. denied, 500 U.S. 905 (1991); Battle v. Pennsylvania, 629 F.2d 269, 275, 280-81 (3d Cir. 1980) (noting problems with retention and need for longer schooling), cert. denied sub nom. Scanlon v. Battle, 452 U.S. 968 (1981). Hence, the cessation of educational services to children with disabilities suspended or expelled for misconduct unrelated to their disability has drastic consequences for those students; consequences which do not apply equally to non-disabled students suspended or expelled. Such cessation has a detrimental effect whether a disabled child's misconduct was disability related or not.

The majority in effect tries to equate two quite different things: expulsion or suspension is one thing while loss of access to a free appropriate public education is another. The majority in effect seeks to have the lesser perform the work of the greater. Suppose that disabled children can be suspended or expelled from regular schools for their misdeeds not related to their handicap. Of course that may happen. A student who acts badly may, and should be in an aggravated case, disciplined by way of suspension or expulsion. The difference with respect to the suspension or expulsion of children with disabilities, however, is that during the period of suspension or expulsion that child's educational services must continue in an alternative setting.

35

Virginia contends that the continued provision of educational services to a disabled child who has been suspended or expelled for misconduct unrelated to his or her handicap is not a suspension or expulsion but merely a transfer, and hence does not effectively serve the State's disciplinary goals as a last resort "wake-up" call to the student. Nothing in the IDEA prevents Virginia from "waking up" these children with suspension or expulsion from their regular school. Virginia, however, as commanded by the IDEA must "wake up" these children by providing an education in an alternative setting during the suspension or expulsion period. The removal of the child from his or her usual classroom and friends will serve to reinforce the inappropriateness of his or her misconduct.

Virginia's statement that "[s]pecial education students are thereby consistently governed by the same rules of accountability and personal responsibility governing others, when disability is not an issue" represents the lack of understanding of the problem presented in the instant case. Petitioner's Brief, at 12 (emphasis added). Regrettably, for a child with a disability, disability is always an issue and relevant. For that child remains disabled when he or she is suspended or expelled from school. An analysis which fails to consider the consequences of the cessation of educational services on a disabled child, fails, in my view to effectuate the purposes of IDEA. The stated purpose of the IDEA is to provide all children with disabilities a free appropriate public education so that those children can become productive members of our society, in the same way as non-disabled children. The IDEA is designed, to the extent possible, to provide disabled children with the tools necessary to close the gap between them and their non-disabled counterparts. I fail to see how ceasing the educational process serves that goal.

Undergirding Virginia's argument, adopted by the majority, is the notion that children with disabilities are being treated differently than their non-disabled counterparts, and failure to cease educational services to these students, as schools do with non-disabled expelled or suspended students, sends the message that children with disabilities are not responsible for their actions. The continuation of educational services to disabled students who are suspended or expelled would result in a "harmful double standard" between the treatment of disabled and non-disabled students, Virginia maintains.

In S-1 v. Turlington, 635 F.2d 342 (5th Cir.), cert. denied, 454 U.S. 1030 (1981), the Fifth Circuit addressed the issue of nine disabled childrens' rights under the IDEA, when the children were expelled from school. After concluding that an expulsion constituted a change in placement for IDEA [then EHA] purposes, the court addressed the discipline issue. The Fifth Circuit in responding to the school officials' argument that removing the disciplinary tool of expulsion with respect to a disabled child would "insulat[e]" a disabled student, the court stated "expulsion is still a proper disciplinary tool . . . when proper procedures are utilized and under proper circumstances." Id. at 348. Thus, the court determined that before a disabled student could be expelled the student was entitled to a hearing to determine whether his misconduct was related to his disability. Nevertheless, the court stated that "[w]e cannot, however, authorize the complete cessation of educational services during an expulsion period." Id.; see also Kaelin v. Grubbs, 682 F.2d 595, 597 (6th Cir. 1982) (following Turlington analysis to conclude that disabled child may be expelled, only after a due process hearing determines that misconduct was not related to handicap, and during the expulsion period educational services may not cease); and see School Bd. v. Malone, 762 F.2d 1210, 1218 (4th Cir. 1985) (court held that disabled student could not be expelled for behavior caused by his disability but declined to address "whether some level of educational services must be continued to a lawfully expelled handicapped child, and if so, to what extent.").

Children with disabilities are not, and cannot be treated, the same as non-disabled students. Any argument based on strict equality of treatment for disabled and non-disabled children must fail. In enacting the IDEA, Congress indeed granted disabled children "more rights" than those enjoyed by non-disabled children. For example, the IDEA confers upon disabled children the right to an annually reviewed "individualized education program," prepared by the school district, the child's teacher and parents, and, when possible, the disabled child himself or herself. See 20 U.S.C. § 1401(a)(2), 1414(a)(5) (Supp. 1996). The "stay-put" provision, discussed in Honig, represents another example of conferring special rights upon disabled children. The Honig holding and its rationale, at least implicitly, relies upon the basic premise that children with disabilities are to be treated differently than children without disabilities.

37

In one fell stroke, the majority alters IDEA by grafting onto its language an exception not provided by Congress for children with disabilities who have been expelled or suspended for misconduct unrelated to their disabilities, namely the cessation of educational services during the period of the suspension or expulsion. Until today's decision, no such exception existed. In my view, if a state refuses to offer educational services to a disabled child due to that child's conduct -- regardless of whether that conduct is a manifestation of the child's disability -- then it has ceased to assure that child of "the right to a free appropriate public education." Contrary to Virginia's belief, the statute in no way indicates that a disabled child forfeits or waives that right when he or she misbehaves in a manner unrelated to his or her disability.

While remedial legislation should be construed broadly to effectuate its purpose, I recognize that the canon of construction does not allow a court to ignore the plain wording of the statute. In the instant case, however, the IDEA's plain language leaves no room for exceptions of the kind that Virginia has asked us to read into it. The Act requires that participating states have "in effect a policy that assures all children with disabilities the right to a free appropriate public education." Hence, the IDEA's unqualified language is sufficiently clear to have enabled Virginia authorities to perceive that they would have to adjust their disciplinary policies for disabled students if they wished to participate in the IDEA-B program. Compare Timothy W. v. Rochester, New Hampshire, Sch. Dist., 875 F.2d 954, 960-61 (1st Cir.) (rejecting argument that, in order to demand educational services under IDEA, a child must show that he or she would benefit from such services; because the IDEA is unequivocal and "is permeated with the words `all [disabled] children' . . . the Act in its entirety makes clear that a `zero-reject' policy is at the core of the Act"), cert. denied, 493 U.S. 983 (1989).

III.

Virginia's proposed exception to the IDEA, sanctioned by the majority, has no support in the statutory language of the IDEA. Moreover, the exception the majority has placed its imprimatur on today is divorced from the very purposes of the IDEA. The majority has succumbed to the temptation which we as judges should steadfastly

38

resist. We should read a statute as it is written, not rewrite it as we would like it to be. It should be Congress not the courts to incorporate in the statute following "all children with disabilities" the phraseology: "excluding those expelled or suspended for misconduct unrelated to their disabilities." The statute as it now stands should reach the conclusion that our legislators have viewed the situation in the round and have been concerned that growing up without any appropriate public education may well, indeed probably will, lead to grownups less able to live intelligently, or at least reasonably, and more prone to the improper conduct which had led to his or her expulsion or suspension in the first place. In other words, an appropriate public education produces better citizens. Special classes other than those termed regular or, where most functional, resort to appropriate correspondence courses prepared by teachers and no doubt other techniques may be used to ensure an appropriate free public education for disabled children who have been expelled or suspended without adversely affecting the classes wherein expulsion or suspension of a handicapped student has occurred. Because I cannot sanction the undermining of the IDEA's noble purposes by leaving 126 children with disabilities without any educational services during a period of expulsion or suspension, I dissent.

_____

HALL, Circuit Judge, dissenting:

I join Judge Murnaghan's dissenting opinion. I write separately, however, to set forth an alternative basis for affirming the Secretary's decision.

If the statute in question is ambiguous, as a majority of the court apparently assumes it to be, I would agree with the majority that "[w]hether [Judge Murnaghan's] interpretation of the statute or that which [the majority] believe[s] Congress intended is the better [ ] is not even the question." 86 F.3d at 1352. I would, however, disagree with the majority's view that "the deference that we ordinarily afford agency interpretations of ambiguous statutes is inapplicable in a case such as this." Id. at 1351 n.4. There are lots of "case[s] such as this" that involve complex funding programs and millions of federal dollars. In the wake of our decision today, the role of the agencies to

39

whom Congress has assigned the task of administering these programs is an uncertain one.

I believe that a majority of the court would agree that Congress could, provided it did so expressly, condition a State's receipt of funds under the IDEA cooperative funding program on the State's continuing to provide educational services to disabled students expelled for reasons unrelated to their disabilities. See South Dakota v. Dole, 483 U.S. 203, 207, 107 S.Ct. 2793, 2796, 97 L.Ed.2d 171 (1987) ("In considering whether a particular expenditure is intended to serve general public purposes, courts should defer substantially to the judgment of Congress."). The statutory provision in question, 20 U.S.C. § 1412(l), is arguably not an unambiguous expression of Congressional intent that such services be provided. The issue, then, is whether we will require that Congress itself define in unmistakable statutory terms each and every string that is or may ever be attached to a State's receipt of funds under a cooperative funding program, or do we defer to a reasonable interpretation made by the federal agency to which Congress has delegated the job of operating the program? In choosing the former, the majority eviscerates the rule of Chevron and establishes a "clear statement rule" that is as unprecedented as it is unworkable.

The majority's holding and the essential analysis supporting it are contained in the first paragraph of part I-B of its opinion: When Congress wants to condition the States' receipt of funds, it must do so in "unmistakably clear terms" in the statute. 86 F.3d at 1352. This "clear statement" rule is derived from Pennhurst State School and Hospital v. Halderman, 451 U.S. 1 (1981), a pre-Chevron decision that had the following to say about the need for a State to know what it is agreeing to when it enters into the cooperative funding scheme:

> [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." . . . [I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.

40

Id. at 17 (citations omitted). Applying this general rule in the manner advanced by the majority takes Pennhurst to an unintended level.

In its discussion of the Spending Clause, the Court in Pennhurst was concerned that a State know what was expected of it when it chose to participate in a federal funding program. Id. at 17-18. Pennhurst simply does not stand for the proposition that every detail of a federal-state cooperative funding program must be spelled out in the statute itself, and we have not so held in the sixteen years since Pennhurst was decided. Indeed, the Supreme Court has recently deferred to the Secretary's interpretation of an IDEA provision in a situation analogous to the one before us. See Honig v. Doe, 484 U.S. 305, 325 n.8 (1988) ("Given this ambiguity [in the phrase `change in placement' used in 20 U.S.C. § 1415(e)(3)], we defer to the construction adopted by the agency charged with monitoring and enforcing the statute.") (citing INS v. Cardozo-Fonseca, 480 U.S. 421, 448 (1987)).

The IDEA gives to the Secretary of Education the authority to administer, interpret and enforce the statute. See 20 U.S.C. §§ 1402(a), 1416, 1417(b). The Secretary's interpretive rule in this case -- that even children expelled for misbehavior unrelated to their disabilities be provided educational services -- was published well before Virginia submitted its application for participation in the program for fiscal years 1993-95. See Metropolitan School Dist. of Wayne Township v. Davila, 969 F.2d 485 (7th Cir. 1992) (discussing the history of the interpretive rule), cert. denied, 507 U.S. 949 (1993). Virginia pursued the benefits of IDEA funding with its eyes wide open. Pennhurst does not suggest that this court should now abrogate those conditions of which Virginia was aware solely because such condition was not precisely spelled out in the few pages of the United States Code that established this sizable government program.

An example from another federal-state funding program will serve to show the unworkability of the majority's rule. At issue in Rehabilitation Ass'n of Virginia, Inc. v. Kozlowski , 42 F.3d 1444 (4th Cir. 1994), cert. denied, 116 S.Ct. 60 (1995), was the meaning of the Medicaid and Medicare statutes' formula for a State's contribution for services to persons eligible under both programs. Acknowledging that Chevron would apply if the statute were ambiguous, id. at 1450, two judges on the panel nevertheless rejected the Secretary of HHS's

41

interpretation and instead adopted an interpretation that they found to be in accord with the clear and unambiguous language of the statute. The concurring opinion, however, provides a glimpse of what the future may hold if Chevron deference is replaced by the clear statement rule adopted by the majority in our case.

After concluding that there was more than one reasonable interpretation of the statutes in question, Judge Niemeyer invoked Chevron to support his view that the court should defer to the federal agency's interpretation. Id. at 1470-71 (Niemeyer, J., concurring in part and dissenting in part). Had the Secretary's interpretation in Kozlowski been the one that mandated increased contributions from the States, we can only wonder how the analysis would have proceeded under the rule announced by the majority in the case before us. Given two reasonable interpretations of a statute, each of which would "condition the State's receipt of federal funds in a particular manner" in the context of a cooperative federal-state funding program, but which would yield different results as far as the financial effect on the participating State, does this very ambiguity ipso facto defeat the federal government's claim that its interpretation should be adopted? Should the courts, faced with an ambiguity, always defer to the interpretation advanced by the State? What effect, if any, does the type of program or amount of money involved have on the analysis? For example, should the courts accord some deference to the Secretary of Transportation with regard to ambiguities in highway-funding statutes, but none whatsoever to the Secretary of Education?

We should not allow the visceral impact of the case before us -- unruly and even dangerous students threatening the fabric of our schools and the physical integrity of our children-- to disguise the portent of the majority's analysis or to cause us to forsake the established rule that we defer to reasonable agency interpretations of the statute.

> When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.

42

Chevron, 467 U.S. at 866. Congress necessarily delegated to the Secretary the authority to administer the IDEA because not every aspect of such a program can be adequately addressed in a statute. The majority's rule will require that the minutiae of cooperative funding programs be spelled out in the statute itself, bringing to mind Justice White's complaint in Pennhurst that "[n]one of the cases cited by the Court suggest, much less hold, that Congress is required to condition its grant of funds with contract-like exactitude." 451 U.S. at 48 n.14 (White, J., dissenting in part).

Our views on the educational and disciplinary policies implicated by the IDEA are irrelevant to the issue at hand. Judge Luttig sets out the case for why the State's interpretation is good policy -- everyone should be treated alike when it comes to discipline, 86 F.3d at 1357 -- and Judge Murnaghan presents the federal government's argument

that it is sound policy to provide unbroken services to disabled children even when they are expelled for behavior unrelated to their disability. Ante at 32-38 (Murnaghan, J., dissenting). But as long as the goal of the federal legislation -- the education of disabled children -- is a proper one (as it most certainly is), and as long as the means selected -- the provision of services to expelled students -- is rationally related to that goal (as Judge Murnaghan's opinion demonstrates it is), our task is at an end.*

I would affirm the decision of the Secretary.

_____

*To bolster its "clear statement" holding, the majority notes that insistence on an unambiguous statutory expression of a condition on the receipt of funds is "especially important where, as here, the claimed condition requires the surrender of one of, if not the most significant of, the powers or functions reserved to the States by the Tenth Amendment." 86 F.3d at 1352. By choosing to accept federal IDEA funding, Virginia certainly "surrendered" a large degree of its"powers and functions" relative to the education of its children. I do not, however, see the majority's discussion of the Tenth Amendment and the clear statement rule in Gregory v. Ashcroft, 501 U.S. 452 (1991), as essential to the majority's holding.

43